UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

PHS GROUP INC.,

                  Debtor.

----------------------------------------------------------X
Marc A. Pergament, Chapter 7 Trustee of the
Estate of PHS Group Inc.,

                  Plaintiff,

v.

Amton Inc., Ernest Barbella, Marguerite Barbella,
Renee Faibish, Libra Marketing, Inc.,
Bektrom Foods, Inc., M-B-A Auto Repair, Inc.
d/b/a G&R Auto Repair, Gamliel Oziel,
Taylor McKenzie Design Corporation, Michael Malka,
TCB Consulting, Inc., Thomas Barbella and
Gourmet Select Foods Corp.,

                  Defendants.

----------------------------------------------------------x

Case No. 8-11-70413-reg
Chapter 7

Adv. Pro. No. 8-13-08085-reg

## <u>DECISION</u>

### (Re: Motion to Strike Amended Complaint
### and/or Grant Summary Judgment, Dismissing Complaint, ECF No. 89)

Before the Court is a motion by defendants, Amton Inc. ("Amton"), Ernest Barbella

("Ernest"), Marguerite Barbella ("Marguerite"), Bektrom Foods, Inc. ("Bektrom"), TCB

Consulting, Inc. ("TCB Consulting"), and Thomas Barbella ("Thomas") (each a "Defendant" and

together, the "Barbella Defendants"), to dismiss the claims asserted against them by the chapter 7

trustee ("Trustee" or "Plaintiff") of the Debtor, PHS Group, Inc. ("Debtor") for, among other

things, breach of fiduciary duty, fraud and conspiracy to defraud, constructive fraud, and unjust enrichment.[1]

The Amended Complaint alleges, in large part, that the Barbella Defendants participated and/or acquiesced in a massive check-kiting scheme perpetrated by Mair Faibish ("Faibish"), CEO of the Debtor and its publicly-traded parent, Synergy Brands Inc. ("Synergy").  On March 15, 2014, Faibish was convicted for defrauding Signature Bank of $26 million through this check-kiting scheme; making false statements to the Securities and Exchange Commission; and defrauding investors by overstating the value of the company.  Although the Defendant, Ernest Barbella, was not indicted as part of this scheme, the Trustee in this case is suing Ernest and the other Barbella Defendants for participating in the scheme by allowing Faibish to use the Barbella Defendants' business checking accounts to further the check-kiting scheme to the detriment of the Debtor.

Because the Amended Complaint alleges that the Barbella Defendants engaged in wrongdoing with the Debtor's principal, the Barbella Defendants seek to dismiss the complaint under the Second Circuit's *Wagoner* doctrine.[2]  *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (Bankruptcy trustee lacks standing to bring a claim against third parties "for defrauding a corporation with the cooperation of management.").  The Barbella Defendants argue that *Wagoner* applies here because they are "third parties," not insiders of the

---

[1]    As explained later in this Decision, Signature Bank, a creditor of this estate, acquired these claims from the Trustee and this action is now being prosecuted by Signature on behalf of the estate.

[2]    The Barbella Defendants' motion seeks dismissal of these claims for a variety of reasons.  (ECF No. 89).  As the *Wagoner* doctrine presented a threshold issue as to the Plaintiff's standing, the Court determined to resolve that issue before all others.

Debtor, and therefore any claim against them for defrauding the Debtor with the cooperation of management accrues to creditors of the Debtor, not the Debtor or the Trustee stepping into the shoes of the Debtor.[3]  They argue that they are not insiders because they were not officers or directors, and/or did not exercise sufficient control over the Debtor to be deemed an "insider."

The Plaintiff argues that the totality of the evidence presented in this matter clearly establishes that the Barbella Defendants exercised sufficient control over the Debtor to be deemed insiders for purposes of the *Wagoner* doctrine. [4]

---

[3]      It should be noted that the *Wagoner* doctrine applies only where a defendant is alleged to have participated in some wrongdoing *with the cooperation of the debtor's management*. The bulk of the Amended Complaint alleges that the Barbella Defendants participated in the check-kiting scheme along with the Debtor's principal. Thus, this *Wagoner* analysis is necessary. However, there are elements of the Amended Complaint that allege independent wrongdoing by the Barbella Defendants, and *Wagoner* poses no bar to those claims. *See, e.g.*, Count I: Breach of Fiduciary Duty (against Ernest) (Ernest "breached [his] fiduciary dut[y] to PHS by, . . . using the companies [he] owned and controlled, including MB Monroe, Bektrom and Gourmet Select, to engage in self-dealing transactions with the Debtor Companies, including PHS, without properly disclosing their interests in those companies or obtaining proper board approval for the Debtor Companies' participation in those transactions.") (Amended Complaint ¶ 286); Count II: Fraud and Conspiracy to Defraud (against all Barbella Defendants) (asserting damages for "diversion of the services of employees of the Debtor Companies, including PHS, to perform services for companies owned and controlled by the Barbellas, including Bektrom, without compensation and at the expense of the Debtor Companies and PHS" and for "any profits obtained by the Barbellas as a result of their self-dealing transactions with the Debtor Companies.") (Amended Complaint ¶ 293); Count IV: NY Bus. Comm. Code § 720 (against Ernest) (alleging self-dealing by Ernest) (Amended Complaint ¶ 303); Count V: Unjust Enrichment (against all Barbella Defendants) (alleging Ernest and the companies he controlled were unjustly enriched in the amount of profits they received from self-interested transactions they entered into with the Debtor, and in the amount they saved by using the services of the Debtor's employees to provide services to Bektrom without compensation) (Amended Complaint ¶ 310).

[4]      The Plaintiff also urges the Court to find that "insider" under the *Wagoner* doctrine refers "to persons who ordinarily would be considered non-third party fiduciaries – *i.e.,* managers and officers of the corporation."  (ECF No. 93, at 23). The Plaintiff would not limit insider/fiduciaries to managers, officers, and/or control persons but would also include all employees who owe their employer a fiduciary duty.  (ECF No. 93, at 23).  The Court disagrees and finds that status as an employee, without more, is not the proper test to determine "insider" status under the *Wagoner* doctrine. *See In re Refco Inc. Sec. Litig.*, Nos. 07-md-1902 (JSR), 08-cv-3065 (JSR), 08-cv-3086 (JSR), 08-cv-7416 (JSR), 08-cv-8267 (JSR), 2010 WL 6549830, at *17 (S.D.N.Y. Dec. 6, 2010) (finding that the "*in pari delicto/Wagoner* doctrine will be evaluated by whether the particular defendant served in a board or management position, or otherwise exercised de facto control over [the debtor], not on whether the defendant more broadly had a fiduciary relationship with [the debtor]"); *see also In Lehr Constr. Corp.*,

The *Wagoner* doctrine and its applicability has been the subject of scores of decisions and scholarly analysis.  However, there appears to be consensus that the doctrine is applicable where a trustee brings an action against third parties and is inapplicable where the defendants are "insiders" of the debtor.  Where the decisions and scholarly articles are not entirely clear is what makes a defendant an insider.  This Decision hopes to clarify that issue.  This Court believes that a formal designation as officer or director of the debtor creates a rebuttable presumption that a defendant is an insider for purposes of the *Wagoner* doctrine.  Conversely, a defendant with no official title can stand on the rebuttable presumption that they are a third party.  However, those presumptions may be challenged.  If a defendant with no title is found to be a control person, then he is an insider.  If the defendant is an officer or director but is found to have no control, then that party may not be an insider despite having a formal title.

Having considered the testimony and evidence presented at trial, weighing the credibility of the witnesses and viewing the totality of the facts presented, the Court finds that the Plaintiff has established by a preponderance of the evidence that the Barbella Defendants' relationship with the Debtor was such that they were in a position to commit the acts alleged in the Amended Complaint and they were thus control persons and insiders of the Debtor for *Wagoner* purposes.[5] Although they held no formal office or title with the Debtor, Defendants, Ernest Barbella and his closely-held companies, Amton Inc. and Bektrom Foods, Inc., exercised sufficient control over the operations of the Debtor during the relevant time periods to be deemed non-third party

---

551 B.R. 732, 743-44 (Bankr. S.D.N.Y. 2016) (rejecting trustee's argument that all employees are "insiders" for purposes of *in pari delicto*).

[5]    The Barbella Defendants urge the Court to view Ernest's involvement with the Debtor in a vacuum, ignoring Ernest's long standing relationship with the Debtor's parent and affiliated companies, and his business dealings with the Debtor and its affiliates.  The Court does not believes such a myopic view is appropriate.

insiders of the Debtor for purposes of the *Wagoner* doctrine. Ernest's son, Defendant, Thomas Barbella, did have a formal title and role with the Debtor and in that role both he, and his company, Defendant, TCB Consulting, also exercised sufficient control over the Debtor to be considered insiders under the *Wagoner* doctrine.

To be clear, this Decision is not determinative of the Barbella Defendants' liability. Furthermore, this Decision is limited to whether the Barbella Defendants are third parties or insiders in relation to the Debtor for purposes of the *Wagoner* doctrine. The remainder of the Barbella Defendants' arguments in their motion are preserved.

## FACTS

Prior to its demise, the Debtor was engaged in a "diverting" business for the following industry segments: (i) groceries (Def.'s Ex. LL, at 28; Trial Tr. 63:24-25 (Jan. 17, 2017)); (ii) baking goods (Def.'s Ex. LL, at 30; Trial Tr. 29:6-14 (July 07, 2016); Trial Tr. 63:24-64:2 (Jan. 17, 2017)); (iii) pasta and potato products (Def.'s Ex. LL, at 30-31); (iv) spices (Def.'s Ex. LL, at 30); and (v) cigar and health/beauty products (Def.'s Ex. LL, at 29-30). Diversion is a practice in which "merchandize intended for a particular distribution channel is shifted to be sold in another without the knowledge or permission of the primary vendor."[6]

The Debtor operated as part of a group of both affiliated and (seemingly) unaffiliated companies with interrelated manufacturing and distribution businesses in the United States,

---

[6]     Nicole Potenza Denis, *Product Diversion: What it is and how to Protect Yourself*, SPECIALTY FOOD ASS'N. (Mar. 13, 2014), https://www.specialtyfood.com/news/article/product-diversion-what-it-and-how-protect-yourself/. Some describe diversion as "a form of arbitrage, [which] takes advantage of price differences -- either by geographic region or between customers who are sold differently priced products at different times." James Bandler, *The Shadowy Business of Diversion*, FORTUNE (Aug. 04, 2009, 4:49 PM ET), http://archive.fortune.com/2009/07/31/news/companies/product_diversion.fortune/ index.htm.

China, and Canada.  Although not employed directly by the Debtor during the time of the acts

alleged in the Amended Complaint, the Defendant, Ernest Barbella, did act as a consultant to the

Debtor and was in a position of authority in many of these affiliated and unaffiliated companies.

To understand this, a summary of the history of the Debtor's business and the Barbella

Defendants' role in that business is necessary.

**Synergy**.  The Debtor is a wholly-owned subsidiary of Synergy, a publicly traded

company which is a holding company that operated principally through the Debtor.  The Debtor

was Synergy's largest subsidiary.  Def.'s Ex. LL, at 29.  Synergy filed a chapter 7 bankruptcy

petition with this Court the same day as the Debtor.  (No. 11-70412-reg).  Formerly known as

Krantor Corporation, Synergy was created in the 1980s by Ernest and Mair Faibish who had

known each other for decades. Trial Tr. 6:22-7:17 (July 07, 2016).  Ernest and Faibish developed

a trusted working relationship over the span of twenty-six years.  Trial Tr. 144:18-23 (Aug. 02,

2016).  Faibish had experience in trading and diverting, but limited experience in the grocery

business.  Trial Tr. 114:2-7; 149:22-23 (Aug. 02, 2016); Pl.'s Ex 3, at 98.  Ernest, on the other

hand, was an experienced professional with over fifty years in the food industry, including

twenty years in senior supermarket executive positions.  Pl.'s Ex. 3, at 97, 99.

Although Ernest testified that Faibish bought him out of the Krantor company in 1984,

Trial Tr. 116:18-20 (Aug. 02, 2016), Ernest also testified that he retained control over Synergy

until 2005 when he sold his preferred shares in the company to Faibish for cash.  Trial Tr. 40:7-

8; 51:2-21 (Oct. 05, 2016).  Ernest's involvement with Synergy did not end, however, when he

divested his ownership interest.  Around 2007, Ernest invested over a million and a half dollars

into the company.  Trial Tr. 122:2-18 (Aug. 02, 2016).  Over time, Ernest received a million

common stock shares in Synergy in return for loans he made and as bonuses for work performed. Trial. Tr. 50:4-18 (Oct. 05, 2016).

During the time period that the check-kiting was taking place, Ernest worked full-time out of Synergy and the Debtor's common offices, along with his sons, Stephen and Thomas, and his wife, Marguerite.  Trial Tr. 110:7-8 (Oct. 06, 2016); Trial Tr. 151:5-12 (Jan. 12, 2017); Trial Tr. 4:25-5:23 (Jan. 17, 2017).  While working at the Debtor's offices, Ernest claimed to be ignorant of the Debtor's finances, Trial Tr. 129:15-18 (Oct. 06, 2016), but he also admitted that he was able to obtain financial information regarding the Debtor's business from his son Stephen, an employee of the Debtor.  Trial Tr. 75:3-17 (Oct. 05, 2016).  Despite divesting himself of any ownership or management role with Synergy and the Debtor, and despite his feigned ignorance of the Debtor's and Synergy's operations, it is clear that Ernest maintained significant control over the flow of funds among the Debtor affiliates and his companies.  *See, e.g.*, Pl.'s Ex. 10 (email wherein Faibish indicated he was "clueless" whether a loan made by Ernest to Synergy was paid, and Ernest explained how he funneled the repayment through his company in China).

**Amton.**  In 2004, prior to the sale of Ernest's interest in Synergy to Faibish, Ernest formed the Defendant, Amton Inc.  Trial Tr. 22:4-11 (July 07, 2016); Pl.'s Ex. 4, at 2.  Amton was created as a vehicle through which Ernest would provide "consulting" services to the Debtor.  According to Ernest, Amton's sole purpose was to receive Ernest's consulting fees which ranged from $114,000 to $210,000 annually, plus bonuses of Synergy stock.  Joint Pretrial Memorandum, at 17 n.6 (ECF No. 107); Trial Tr. 26:12-17 (July 07, 2016); Trial Tr. 77:8-16 (Oct. 06, 2016).  While the public records list Ernest's wife, Marguerite, as the owner of Amton,

the record here demonstrates that Ernest made all business decisions regarding the company. Trial Tr. 22:6-22 (July 07, 2016).

In January 2006, the Debtor formally retained Ernest, through Amton, for the purpose of developing a private label program, later known as Qualify Food Brands ("QFB"), a subsidiary of the Debtor.[7] Pl.'s Ex. 45; Trial Tr. 61:12; 131:9-132:3; 133:10-18 (Aug. 02, 2016). Amton and the Debtor entered into a written agreement whereby Amton agreed to: develop customers for the Debtor; secure sources for production; develop marketing plans; secure trademarks for packaging and manufacturing; retain professionals to provide expert opinions; and report progress for a service period ending December 2007. Pl.'s Ex. 45. Ernest testified that he worked full time for the Debtor prior to this formal agreement. Trial Tr. 129:13-16 (Aug. 02, 2016). Once he was retained through Amton, he performed those consulting services for the Debtor from 2006 until around 2010. Trial Tr. 26:18-20 (July 07, 2016). During this time period, Ernest communicated with the Debtor's lawyers; disputed a landlord legal issue pertaining to the Debtor; determined the settlement amount for the landlord dispute; and handled a bill dispute for the Debtor. Trial Tr. 47:22-48:2; 54:13-19 (Aug. 02, 2016); Trial Tr. 106:10-12 (Oct. 06, 2016). Ernest claimed that the instructions he gave to the Debtor's lawyers were based on instructions he received from Faibish. Trial Tr. 48:12-17 (Aug. 02, 2016).

In addition to those specific consulting services provided through Amton, Ernest, individually, served as a point of contact for the Debtor on several occasions. *See, e.g.*, Pl.'s Ex.

---

[7]      As discussed later in this Decision, an involuntary chapter 7 petition was filed against QFB on April 06, 2011. (No. 8-11-72285-reg). After an order for relief was entered against QFB, it was Ernest who prepared and signed QFB's schedules. Pl.'s Ex. 108.

28L (listing himself as the point of contact on the Debtor's application to the Department of Homeland Security, and listing Faibish as the authorizing company official); Trial Tr. 101:22-24 (July 07, 2016); Pl.'s Ex. 28M (showing a letter from Ernest to U.S. Customs on the Debtor's letterhead); Pl.'s Ex. 27 (Ernest signed a consulting contract on Synergy/PHS letterhead, identifying himself as the "Director of Operations" for Synergy Brands); Trial Tr. 102:16-19 (July 07, 2016) (listing himself as an import director for the Debtor).  Ernest testified that despite these documents he never served as an import director for the Debtor.  Trial Tr. 102:20-21 (July 07, 2016).  However, he later acknowledged that he did list himself as an import director for the Debtor and was, in fact, in charge of the imports; he was just never paid for that work.  *Id.* at 103:8-17.

Finally, although Ernest testified that Amton was created solely for the purpose of receiving Ernest's consulting fees, Amton accounts were also used to engage in commodities trading for the Debtor.  *Id.* at 144:22-145:3.  Ernest testified that he permitted Faibish to use Amton's bank account for this purpose.  *Id.*  Ernest acknowledged that Faibish would deposit funds into the Amton account, and an equivalent amount would then be withdrawn.  *Id.* at 146:20-147:9.  Ernest was paid $500 as commission for each transaction.  *Id.* at 147:2.  Ernest claims to have been unaware that these checks were written in furtherance of Faibish's check-kiting scheme.  *Id.* at 149:19-24.  The Amended Complaint alleges that Ernest knowingly allowed Amton's accounts to be used in furtherance of Faibish's scheme.

**Bektrom.**  In 2006, Ernest invested money into an entity, Bektrom Industries, which then began serving as a third party manufacturer selling pasta and potato products to the Debtor.  Trial Tr. 69:23-70:1, 12-13 (Aug. 02, 2016).  By 2009, Ernest had purchased Bektrom Industries' assets and created the Defendant, Bektrom Foods, Inc. ("Bektrom") to carry on Bektrom

9

Industries' business. *Id.* at 72:10-16; 83:6-12.  Marguerite and Stephen Barbella were listed as officers of Bektrom, but had no actual role in the corporation. *Id.* at 75:19-76:11.  Ernest acknowledged that he was the owner of Bektrom. *Id.* at 73:15-16.

Bektrom's expenses and overhead were paid entirely with the cash flow generated by its sales to the Debtor and QFB.  Trial Tr. 84:14-85:6 (Aug. 02, 2016).  The record reflects that Ernest instructed QFB's employees to pay Bektrom's bills.  Trial Tr. 200:9-201:8 (Oct. 05, 2016).  In addition, Ernest would sometimes appear on both sides of negotiations between Bektrom and the Debtor/QFB.  Trial Tr. 158:16-22 (Oct. 05, 2016).  Like Amton, the record reflects that Ernest controlled Bektrom's business decisions despite having no formal role with the company.  The record also reflects that checks were written from Bektrom's bank account in furtherance of Faibish's check-kiting scheme. *Id.* at 182:2-183:19.  Ernest testified that Faibish was a "professional crook," and Ernest had no knowledge of what Faibish did with the checking account. *Id.* at 126:12-15.

In 2011, Thomas Barbella negotiated with Ernest to buy Bektrom.  Trial Tr. 174:21-175:23 (Jan. 12, 2017).  Today the Bektrom business, owned by Thomas, is conducted from Ernest's home, Trial Tr. 45:22-46:1 (Aug. 02, 2016), and former employees of the Debtor— Mitchell Gerstein (Chief Financial Officer (CFO) for the Debtor, Synergy, and QFB), Darren Denson (former computer administrator and accounts payable employee for the Debtor), David Sharin (former Executive VP for the Debtor), Thomas Barbella, and Stephen Barbella—now work for Bektrom.  Trial Tr. 46:2-11 (Aug. 02, 2016); Trial Tr. 141:18-25 (Jan. 17, 2017); Trial Tr. 71:7-13 (Jan. 18, 2017).

**Gourmet Select.**  Sometime in 2005, Ernest established Gourmet Select Foods, Corp. ("Gourmet Select") to serve as an intermediary to import spices from China for sale by the Debtor, and to serve as a representative for the Chinese spice company, Qingdao Gourmet Select ("Qingdao"), which was formed by Ernest the following year.  Trial Tr. 50:14-51:1 (July 07, 2016).  When creating Gourmet Select, Ernest used the Debtor's employees, offices, and computers to establish the company.  *Id.* at 48:24-49:5; Trial Tr. 20:10-13 (Aug. 02, 2016). Ernest performed his work for Gourmet Select from the Debtor's offices and instructed his son Stephen, an employee of the Debtor, to help with the business operations of Gourmet Select. Trial Tr. 139:10-17 (July 07, 2016).  Gourmet Select had no other employees.  *Id.* at 81:12-17.

Ernest testified that the creation of Gourmet Select was part of the consulting services he agreed to perform for the Debtor through Amton.  *Id.* at 44:11-13; 45:4-13.  However, Ernest developed Gourmet Select prior to signing any formal consulting agreement with the Debtor.  *Id.* at 70:19-22.  He explained this by stating that he had stock in Synergy, and despite not having a formal arrangement with the Debtor at the time, he created Gourmet Select because he had loyalty to the Debtor and wanted to see Faibish succeed.  *Id.* at 72:11-20.

As the intermediary, Gourmet Select would receive payments from the Debtor and/or QFB and transmit those funds to Qingdao.  *Id.* at 47:11-16.  Ernest explained that in 2007, Faibish told him to use Gourmet Select as an intermediary between Qingdao and QFB.  Trial Tr. 107:6-13 (Oct. 05, 2016).  He further explained that this was necessary because the Debtor and QFB did not know what to do with the spice business, but Ernest did.  Trial Tr. 162:15-18 (Oct. 06, 2016).

Although the Gourmet Select bank account was in his wife's name, Ernest made all decisions on what went into and out of the account. Trial Tr. at 82:4-19; 139:18-21 (July 07, 2016). In addition, Faibish often placed wire transfers from unknown lenders into the Gourmet Select account, and Ernest would write checks from Gourmet Select to the Debtor for that same amount. *Id.* at 141:21-143:7; *see also Barbella & Gourmet Select Foods, Corp. v. Pergament*, No. 16-MC-1221 (E.D.N.Y. Jan. 08, 2018) ("[Ernest] Barbella signed the majority of the checks issued by Gourmet Select to PHS in the course of the [check-kiting] scheme."). Ernest testified that he wrote these checks at Faibish's direction. Trial Tr. 143:2-3 (July 07, 2016).

After the Debtor filed for bankruptcy, Gourmet Select began operating its business for a brief period of time out of Ernest's home. Trial Tr. 44:17-45:4 (Aug. 02, 2016). Today, the company is no longer active. *Id.*

**Qingdao.** Qingdao is a company based out of China that was established by Ernest[8] sometime in 2007 for the sole purpose of developing spices for sale to the Debtor. Trial Tr. 92:20-21; 93:5-7 (Oct. 05, 2016). The Debtor was Qingdao's sole customer. Trial Tr. 48:20-49:1 (Jan. 12, 2017). Ernest testified that he helped form Qingdao, but his Chinese colleague, Mr. Wei Wei, owned it; Ernest claims he, through Gourmet Select, merely served as a representative for the Chinese company and an intermediary between the Debtor and Qingdao. Trial Tr. 50:24-51:1; 54:12-55:4; 60:18-21 (July 07, 2016). Although never reduced to writing, Ernest negotiated an agreement between the two companies to ensure the Debtor paid all of

---

[8]    Ernest provided inconsistent testimony regarding his involvement with Qingdao. At trial, he testified that he did not form the spice business in China (Trial Tr. 53:18-19 (July 07, 2016)); however, in his deposition and in a presentation he made to the Trustee, Ernest stated that he did form the Gourmet Select business in China. In addition, Joel Sebastian, a board member for Synergy, testified that he believed Ernest owned the Qingdao business. Trial Tr. 100:15-17 (Jan. 12, 2017). Ernest was also listed as the legal representative for Qingdao.

Qingdao's expenses.  *Id.* at 95:10-20; 96:13-19; Trial Tr. 178:6-18 (Oct. 06, 2016).  In addition, Ernest was responsible for government reporting regarding the Debtor's relationship with Qingdao and processed the Debtor's orders to Qingdao.  Trial Tr. 67:20; 97:13-98:1 (July 07, 2016).  Mitch Gerstein—CFO for the Debtor, Synergy, and QFB—testified that the Barbellas were the only persons he knew to deal with money going from the Debtor to Qingdao.  Trial Tr. 153:23-154:2 (Jan. 17, 2017).

Ernest submitted expense reports to the Debtor every month to pay for Qingdao expenses. Trial Tr. 118:5-10, 15-17; 121:6-10 (July 07, 2016).[9]  Ernest directed the Debtor's employees, Tina Norris and Darren Denson, to not only create the Qingdao invoices but also to pay them. Trial Tr. 8:21-9:15 (Jan. 12, 2017); Pl.'s Ex. 6F; Trial Tr. 165:8-11 (Jan. 18, 2017).  Ms. Norris testified that she would always seek authorization from Faibish before creating those invoices, but the payments were never denied.  Trial Tr. 121:6-10 (July 07, 2016); Trial Tr. 8:14-20 (Jan. 12, 2017); Trial Tr. 146:14-19; 147:19-21 (Jan. 18, 2017).  Finally, in 2008, upon Ernest's recommendation the Debtor paid bonuses to Qingdao employees.  Trial Tr. 104:8-22 (July 07, 2016).

**MB Monroe.**  In addition to orchestrating the Debtor's business of importing spices from China, Ernest also managed to facilitate the Debtor's acquisition of a baking mix business ultimately owned by the Debtor's wholly owned subsidiary, QFB.  In 2006, Ernest obtained ownership of MB Monroe Properties, Inc. ("MB Monroe").  MB Monroe owned a production facility that it leased to Loretta Foods ("Loretta"), a Canadian company that produced baking mix products.  Trial Tr. 34:10-16 (July 07, 2016).  Marguerite Barbella was the listed owner of

---

[9]    The invoice requests Ernest submitted to the Debtor's employees referred to the Debtor and not QFB.  Trial Tr. 9:8-11 (Jan. 12, 2017).

MB Monroe, but Ernest made all of the business decisions for the company.  Trial Tr. 33:2-17 (July 07, 2016); Trial Tr. 17:16-20 (Jan. 12, 2017).

Sometime after Ernest acquired MB Monroe, a partnership between Loretta and the Debtor/Synergy was created, where Loretta supplied baking products to the Debtor for sale in the United States.  Trial Tr. 19:17-18; 21:8-10 (July 07, 2016).  Ernest assisted the Debtor with its relationship with Loretta by opening doors with his pre-existing contacts and securing customers. Trial Tr. 21:8-13 (July 07, 2016); Trial Tr. 128:16-24 (Aug. 02, 2016).

In the Spring of 2007, Loretta was in financial distress and on the verge of bankruptcy. At that time, Ernest, representing MB Monroe, told Loretta to sell their business to the Debtor. Trial Tr. 29:6-9 (July 07, 2016).  Ernest testified that he made this ultimatum at the direction of Faibish.  *Id.*  Synergy and the Debtor did acquire Loretta's baking mix operations and it was subsequently renamed Quality Food Brands (QFB).  *Id.* at 29:10-14.  MB Monroe then leased its facility to the Debtor and QFB.  Pl.'s Ex. 61.  The rent that was paid under the lease went directly to MB Monroe, which benefitted the Barbellas. Trial Tr. 35:20-36:3 (July 07, 2016).

MB Monroe also loaned money to QFB; Ernest testified that his wife drew the checks and gave them to Faibish.  Trial Tr. 170:9-171:6 (Jan. 18, 2017).  In addition to loaning money and providing the Debtor with a new baking mix business, MB Monroe bought the Debtor's equipment and then leased it back to the Debtor, Synergy, and QFB for cash payments and Synergy stock.  Trial Tr. 174:6-175:21 (July 07, 2016); Pl.'s Ex. 61.  Today, MB Monroe owns all of the equipment and it is being used for Bektrom's business.  Trial Tr. 92:9-13; 93:17-25 (Aug. 02, 2016).  Ernest also gave a portion of MB Monroe's Synergy stock to his sons, Thomas

and Stephen.  Trial Tr. 170:4-14 (July 07, 2016).  The rest of the stock remains in MB Monroe's

possession.  Trial Tr. 151:7-11 (Oct. 06, 2016).

**QFB.**   In May 2007, Quality Food Brands was formed to take over Loretta's baking mix

business, sell potato and pasta products, and serve as a replacement for the Debtor in its spice

transactions with Qingdao.  Trial Tr. 117:17-22 (Jan. 17, 2017); Trial Tr. 58:7-12 (Aug. 02,

2016).  As previously discussed, Ernest was instrumental in creating the opportunity for the

Debtor to acquire the baking mix business through Loretta Foods.  Ernest also obtained

customers for QFB and provided the facility for QFB to continue the business.

Although he was not an employee of QFB, Ernest testified that he had control, without

Faibish's approval, over customer solicitation, product development, pricing, and package design

for the QFB business.  Trial Tr. 67:11-17; 81:8-9, 19-25 (Oct. 05, 2016).  According to Ernest,

everything else he did for QFB was always done at the direction of Faibish and never on his

own.  Trial Tr. 129:1-8 (Oct. 06, 2016).  Although Ernest testified that he reported to Faibish

because "he was the boss," Trial Tr. 151:20-22; 152:15-16 (Aug. 02, 2016), Ernest was

sometimes found on both sides of the table during negotiations between QFB and Ernest's pasta

production company, Bektrom.  *Id.* at 95:7-18.  Ernest was often involved with the QFB brokers

and gave them the Debtor's credit references to influence business deals with QFB.[10]  Trial Tr.

164:3-16 (Oct. 05, 2016); Trial Tr. 108:1-5 (Oct. 06, 2016).  Ernest was also in charge of pricing

---

[10]      The Court notes, without deciding the issue, that there appears to have been a lack of formal
corporate distinctions between QFB and the Debtor.  The Debtor and QFB regularly transferred money
between each other to pay their suppliers.  Trial Tr. 28:16-24 (Jan. 18, 2017). According to Mitch
Gerstein, these transactions were made depending on the company's available cash and were reconciled
on a daily basis.  *Id.* at 29:1-5. However, there were no formal guidelines for the intercompany transfers.
*Id.* at 16:6-9. In addition, there is disagreement among the parties as to whether QFB or PHS was the
entity doing business with Qingdao.  This disagreement, it seems, stems from this absence of formal
distinctions.

15

products for QFB, and he testified that he priced products with a small profit to himself to make QFB a success so that it would increase the value of his shares in Synergy.  Trial Tr. 106:23-107:1 (Aug. 02, 2016); Trial Tr. 152:20-23 (Oct. 06, 2016).

Ernest also exerted influence over hiring decisions at QFB and Synergy.  He recommended that Faibish hire various employees for QFB and Synergy.  He recommended Joel Sebastian become a member of Synergy's board of directors.  Trial Tr. 58:1-3; 103:1-10 (Jan. 12, 2017).  Ernest also recommended that Faibish hire Aldon Reed as a consultant for QFB and hire Richard Cohen as the President/CEO of QFB.  Trial Tr. 157:4-5 (Aug. 02, 2016); Trial Tr. 69:15-22; 70:9-10 (Oct. 05, 2016).  In addition, Ernest recommended Cohen's salary and what bonuses the QFB employees should receive.  Trial Tr. 70:21-22; 84:16-17 (Oct. 05, 2016).  Ernest would also direct QFB employees to perform tasks for the Debtor and QFB.  Although Ernest maintained no formal role at QFB, Cohen testified that he would report to Ernest.  *Id.* at 153:3-5.  Cohen was directed to open bank accounts for Bektrom, sign Bektrom checks, and interact with Bektrom employees.  *Id.* at 157:4-16; 166:22-167:8.  Reed was also directed by Ernest to convince Faibish that an item had merit and should be put on the market.  Trial Tr. 150:1-13 (Aug. 02, 2016).

In 2010, Faibish appointed Ernest's son, Stephen, to serve as the CEO and Chairman of QFB.  Def.'s Ex. FF; Trial Tr. 87:19-24 (Jan. 17, 2017).  Ernest explained that he and his sons, Thomas and Stephen, were an "inseparable team that [] functioned exclusively for the benefit of [the Debtor] and QFB."  Pl.'s Ex. 3.

Finally, an involuntary chapter 7 petition was filed against QFB on April 06, 2011. (No. 8-11-72285-reg).[11]  After an order for relief was entered, it was Ernest who prepared and signed QFB's schedules. Pl.'s Ex. 108.

**Thomas Barbella.**  Ernest's son, Defendant, Thomas Barbella, also had close ties to the Debtor and its affiliates.  Thomas worked for Synergy from "its early days" going back to when Ernest owned Krantor with Faibish   (ECF No. 127, at 41).  During the time period at issue here, Thomas served as the Senior Vice President for the Debtor.  Trial Tr. 153:18-20 (Jan. 12, 2017).  In this role, Thomas managed the Debtor's grocery business.  Some of his duties included: purchasing inventory; pricing products; supervising and managing sales employees for the local distribution business; signing off on invoices and checks; and managing the accounts receivable for the Debtor and the commissions payable to the sales group.  *Id.* at 152:9-16; 155:24-25; Trial Tr. 68:20-69:3; 164:4-9 (Jan. 18, 2017).  Thomas stated that he ensured the salespeople were keeping prices in line with what Faibish established, and would often seek approval from Faibish if a deal was not within the net profit range.  Trial Tr. 153:1-13 (Jan. 12, 2017).  During Thomas' time with the Debtor he generated $30 million in sales and a $2 million net profit.  Trial Tr. 107:8-18 (Aug. 02, 2016).  Thomas also owned Synergy stock that he received from Ernest.  Trial Tr. 170:4-14 (July 07, 2016); Trial Tr. 174:2-9 (Jan. 12, 2017).  In addition, Thomas now

---

[11]    The chapter 7 trustee, Marc A. Pergament, filed an adversary proceeding against Ernest Barbella and Gourmet Select Foods, Corp. in QFB's bankruptcy case alleging fraudulent conveyance and participation in the check-kiting scheme.  (No: 8-16-08007-reg, ECF 1). Ernest and Gourmet Select filed a motion to dismiss, which was denied by this Court on April 14, 2016. (No: 8-16-08007-reg, ECF 13). The defendants subsequently filed a motion for leave to appeal (No. 8-16-08007-reg, ECF No. 15), which was denied by the District Court on January 08, 2018, finding that there existed no exceptional circumstances for an interlocutory appeal. *Barbella & Gourmet Select Foods, Corp. v. Pergament*, No. 16-MC-1221 (E.D.N.Y. Jan. 08, 2018) (order denying Defendant's motion for leave to appeal).

owns Bektrom Foods, which he acquired from his father, and which employs several former employees of the Debtor.  *See Bektrom discussion supra.*

**TCB Consulting.**  Thomas created the Defendant entity known as TCB Consulting, which was solely owned and controlled by him.  Just as his father performed "consulting" work for the Debtor through Amton, Thomas used TCB Consulting to perform consulting work for QFB.  Trial Tr. 156:21-23 (Jan. 12, 2017).  According to Thomas, the work he performed for QFB was, in part, to transition part of the Debtor's distribution business to QFB.  *Id.* at 157:4-158:13. In addition, just as Ernest gave Faibish permission to use Amton's bank accounts, so too did Thomas give Faibish permission to use the TCB Consulting bank account for commodities trading for the Debtor.  *Id.* at 162:9-164:19.  Faibish was provided with a stamp so he could sign TCB Consulting checks in Thomas' name.  *Id.* at 164:20-24.  Thomas testified that he was told he would receive a commission for this service, and did not see anything wrong with it because he trusted Faibish.  *Id.* at 162:18-19.

## PROCEDURAL HISTORY

On January 28, 2011, the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.  On May 31, 2013, the Trustee filed an adversary complaint against Ernest Barbella, Thomas Barbella, Amton Inc., Bektrom Foods, Inc., TCB Consulting, Inc., and others.[12] In the original complaint, the Trustee claimed that the Barbella Defendants were

---

[12]    The complaint also named Marguerite Barbella, Renee Faibish, Libra Marketing, Inc., M-B-A Auto Repair, Inc. d/b/a G&R Auto Repair, Gamliel Oziel, Taylor McKenzie Design Corporation, and Michael Malka.  A notice of default was filed by the Plaintiff on October 08, 2014, against M-B-A Auto Repair, Inc. d/b/a G&R Auto Repair, Gamliel Oziel, Taylor McKenzie Design Corporation, and Michael Malka for not timely filing an answer or responsive motion. (ECF No. 39).  The claims against Renee and Libra Marketing (collectively, "Libra Defendants") are still pending. The Libra Defendants filed a motion to dismiss, which was denied. (ECF No. 57).

unjustly enriched, aided and abetted fraud, and aided and abetted in breaching a fiduciary duty. (ECF No. 1).

On July 03, 2013, the Barbella Defendants moved to dismiss the original complaint on the grounds that the Trustee lacked standing and failed to plead proper claims. (ECF No. 6).  The Trustee filed opposition on September 03, 2013, arguing among other things that he had standing because the adverse interest exception to the *Wagoner* doctrine applied. (ECF No. 9).  The Trustee at that time did not argue that the Barbella Defendants were insiders of the Debtor and thus this issue was never raised in connection with that motion.  A hearing was held on September 09, 2013, and the Court denied the motion to dismiss, without prejudice, finding that, accepting the facts as plead to be true, the Trustee presented a plausible set of facts upon which relief could be granted. (ECF No. 10).

On October 23, 2013, the Trustee sought approval of a settlement of the adversary proceeding with Barbella Defendants for $40,000.00. (ECF No. 13).  Signature opposed the settlement arguing the Barbella Defendants were insiders who were integral to the fraud perpetrated upon them by the Debtor and that there was no justification for settling a potential $30 million lawsuit for $40,000.  A hearing was held on January 08, 2014, but in light of Signature's objection the Trustee's motion was subsequently withdrawn. (ECF No. 21).  On July 31, 2014, this Court issued an Order granting Signature the right to purchase all of the Trustee's claims against the Barbella Defendants, (No. 11-70413, ECF No. 151), and Signature was substituted for the Trustee as Plaintiff.

In the meantime, on May 20, 2014, the Barbella Defendants filed a motion for summary judgment. (ECF No. 23).  Signature, now the Plaintiff, filed opposition to the summary judgment

motion on September 10, 2014. (ECF No. 29).  On August 05, 2015, the Plaintiff filed an

Amended Complaint, thus mooting the May 20, 2017 motion for summary judgment. (ECF No.

82).  The Amended Complaint dropped the aiding and abetting claims against the Barbella

Defendants and alleged breach of fiduciary duty, fraud and conspiracy to defraud, constructive

fraud, unjust enrichment, turnover, and a violation of New York's Business Corporation Law.

The Amended Complaint also added Gourmet Select as a defendant and included QFB as a

collective Plaintiff in the action.

On September 21, 2015, the Barbella Defendants filed the instant motion to strike the

Amended Complaint or, in the alternative, for summary judgment.  (ECF No. 89).  Responsive

papers were filed by both parties on October 19 and 26, 2015. (ECF No. 93, 98).  On October 28,

2015, the Court granted the Barbella Defendants' motion for summary judgment in part. (ECF

No. 99, at 59:6-10).  First, the Court found that to the extent that the Amended Complaint sought

to recover damages suffered by QFB, the Plaintiff did not have standing to pursue those claims

because Signature only acquired PHS' claims.  (ECF No. 99, at 42:20-43:11).  Second, the Court

dismissed the claims against Gourmet Select because Signature's purchase of the Trustee's

claims did not include claims against Gourmet Select.  (ECF No. 99, at 54:13-55:19).  Thus, the

claims against Gourmet Select and those accruing to QFB were dismissed.

In the instant motion for summary judgment, the Barbella Defendants reassert their

argument that the *Wagoner* doctrine bars the Plaintiff's claims.  Because the application of the

*Wagoner* doctrine would potentially defeat most of the claims against the Barbella Defendants,

the Court determined to hold an evidentiary hearing on the limited issue of whether the Barbella

Defendants were control persons, fiduciaries,[13] or insiders of the Debtor. It is undisputed that if the Barbella Defendants are found to be insiders, this is dispositive as to the application of the *Wagoner* doctrine. This limited issue was tried over the course of seven non-consecutive days from July 07, 2016, to January 18, 2017.

At trial, Plaintiff's exhibits 3, 4, 5B, 5D, 5F, 5J, 5K, 5M, 5N, 5O, 6F, 7, 8, 10, 14, 15, 17, 26, 27, 28A, 28L, 28M, 35, 37, 39B, 40D, 41, 45, 52, 54, 57, 60, 61, 62, 65, 67, 77, 78, 90, 91, 93, 95, 97, 98, 108, 109, 110, and Defendants' exhibits BB, CC, DD, FF, JJ, LL, and Y(2) were entered into evidence. The witnesses that appeared and testified were: Ernest Barbella, Richard Cohen, Joel Sebastian, Thomas Barbella, Stephen Barbella, Mitchell Gerstein, David Sharin, Aldon Reed, Christina Norris, and Darren Denson. On February 14, 2017, a partial directed verdict was granted dismissing all claims against Marguerite Barbella. (ECF No. 126).[14]

Post-trial briefs were filed on March 21, 2017 (ECF No. 127, 129), and reply briefs were filed on April 14, 2017 (ECF No. 130, 131), at which time this matter was taken under advisement.

---

[13]      *See supra* note 4.

[14]      At the conclusion of the hearing, the Court granted the motion for directed verdict as to Marguerite because there was insufficient evidence in the record to establish her as a "control" person. Although Plaintiff's counsel did not consent to dismissal of the claims against Marguerite, he did concede that she "played a very minor role" and "the evidence against her is likely the weakest." (ECF No. 118, at 106-07).

## **DISCUSSION**

### **The *Wagoner* Doctrine**

In bankruptcy proceedings, the "trustee stands in the shoes of the bankrupt corporation" and only has standing to bring actions that the debtor could have brought prior to the bankruptcy filing. *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). Under the *Wagoner* doctrine, however, a bankruptcy trustee lacks standing to bring a claim against *third parties* "for defrauding a corporation with the cooperation of management." *Id.* at 120; *see also In re Veresta, Inc.*, 343 B.R. 444, 478 (Bankr. S.D.N.Y. 2006) ("[P]laintiff acting on behalf of a debtor cannot sue an outside professional or other third party for damages for which the corporation itself can be held responsible."). This doctrine draws on the state law affirmative defense of *in pari delicto* and standard agency principles which allow the imputation of management's misconduct to the corporation itself. *Kirschner v. Grant Thornton LLP*, No. 07 Civ. 11604(GEL), 2009 WL 1286326, at *5 (S.D.N.Y. Apr. 14, 2009). In bankruptcy, a trustee standing in the shoes of the debtor corporation, cannot sue "to recover for a wrong that he himself essentially took part in." *Id.* (citing *Wight v. Bank America Corp.*, 219 F.3d 79, 86-87 (2d Cir. 2000)). Such claims accrue to the creditors of the guilty corporation, rather than the corporation itself. *Wagoner*, 944 F.2d at 120. Thus, the *Wagoner* doctrine is a Second Circuit doctrine which elevates the *in pari delicto* defense to a jurisdictional bar based on lack of standing. *In re Lehr Construction Corp.*, 551 B.R. 732, 739 (Bankr. S.D.N.Y. 2016); *In re Refco Inc. Sec. Litig.*, Nos. 07-md-1902 (JSR), 08-cv-3065 (JSR), 08-cv-3086 (JSR), 08-cv-7416 (JSR), 08-cv-8267 (JSR), 2010 WL 6549830, at *6 (S.D.N.Y. Dec. 6, 2010).

The *Wagoner* doctrine, however, does not apply to claims against insiders. *See, e.g.*, *In re Refco*, 2010 WL 6549830, at *15 ("The *Wagoner* doctrine is inapplicable to claims by or on behalf of the corporation against insiders for damages caused by their misconduct as corporate insiders."); *In re Optimal U.S. Litigation*, 813 F.Supp.2d 383, 400 (S.D.N.Y. 2011) ("[I]n pari delicto 'does not apply to the actions of fiduciaries who are insiders in the sense that they either are on the board or in management, *or in some other way control the corporation.*'"); *SIPC v. Madoff (In re Madoff Securities)*, 987 F.Supp.2d 311, 322 (S.D.N.Y. 2013) (dismissing claims against insiders' spouses who were in no way involved in the Madoff fraud, and finding that "[t]he purpose of the insider exception is to hold fiduciaries responsible for their conduct as control persons"). This is so because the *in pari delicto* doctrine, upon which *Wagoner* is based, only applies when the parties involved are "in equal fault." An insider will not be "in equal fault" with a debtor since it has the ability to control the corporation's conduct. *In re Refco*, 2010 WL 6549830, at *15 (citing *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990)). Where a defendant is in a position to have caused the bad acts alleged in the complaint, then that defendant's actions can be imputed to the corporation for purposes of *in pari delicto*. The insider exception derives from the notion that it would be inequitable to allow an insider to rely on such imputation because it would essentially shield the insider from the "consequences of their own handiwork." *Id.* at *16; *In re Walnut Leasing Co.*, No. 99-526, 1999 WL 729267, at *5 (E.D.Pa. Sept. 8, 1999); *see SIPC v. Madoff*, 987 F.Supp.2d at 322. Thus, a trustee, standing in the shoes of a debtor, is permitted to assert claims against the corporate debtor's insiders when there is an alleged injury to the debtor. *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 122 (Bankr. S.D.N.Y. 2011).

The *Wagoner* doctrine is a question of standing, and since standing is a jurisdictional matter, "it is the burden of the party who seeks the exercise of jurisdiction in his favor" to clearly allege facts showing he is the proper party to invoke these claims against the defendants. *See Wagoner*, 944 F.2d at 117 ("[S]tanding is jurisdictional under Article III of the United States Constitution."); *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994). The burden thus falls on the Plaintiff to establish by a preponderance of the evidence that each of the Barbella Defendants is an "insider" of the Debtor. *See Kirschner*, 2009 WL 1286326, at *20 ("Viewing *in pari delicto* as a matter of standing places the burden of pleading and proof on the plaintiff . . ."); *In re Grason*, 486 B.R. 448, 457 (Bankr. C.D. Ill. 2013) ("The party asserting standing has the burden of establishing its existence by a preponderance of the evidence.").

## What is an "Insider"?

Under the Bankruptcy Code, in the corporate context, the term "insider" includes a "director of the debtor; officer of the debtor; person *in control* of the debtor; partnership in which the debtor is a general partner, general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B) (emphasis added). Persons falling within this definition are considered "statutory insiders." Courts, recognizing that this statutory definition was not intended to be an exhaustive or exclusive list of roles that may qualify a person for insider status, have developed the notion of a "non-statutory" insider. The non-statutory insider need not have actual control over the Debtor; rather, the question there "is whether there is a close relationship [between debtor and third party] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length." *In re Winstar Commc'n Inc.*, 554 F.3d 382, 396-97 (3d Cir. 2009) (citing *In re U.S. Medical, Inc.*, 531 F.3d 1272, 1276-77 (10th Cir. 2008)); *see also* S.Rep. No. 95–989, at 25 (1978), *reprinted in*

1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor."); *In re 455 CPW Assoc.*, No. 99-5068, 2000 WL 1340569, at *5 (2d Cir. Sept. 14, 2000); *In re KDI Holdings, Inc.*, 277 B.R. 493, 499, 512 (Bankr. S.D.N.Y. 1999) (indicating that the defendant's close relationship—as "first cousins and long-standing business partners"—with the debtor's sole shareholder was instructive in determining the defendant's status as an insider).

There are, however, many and varying contexts in which insider status is legally significant in the bankruptcy context.  In the specific context of *Wagoner* and *in pari delicto*, courts have defined an "insider" as one that is "on the board or in management, or in some other way control[s] the corporation." *In re Refco*, 2010 WL 6549830, at *16, 31; *see also e.g., Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558(GEL), 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 03, 2006) ("[T]o the extent plaintiff can establish that defendants' alleged control and domination of [the debtor] rendered them corporate insiders and fiduciaries, *Wagoner* and the 'in pari delicto' rules will not bar plaintiff's fiduciary duty claims."); *In re KDI Holdings, Inc.*, 277 B.R. at 511 ("[A] creditor will be held to an insider standard where it is found that it dominated and controlled the debtor.").  The "control" analysis for purposes of the *Wagoner* doctrine focuses not on what fraudulent conduct the defendant committed, if any, but solely on whether the defendant had enough control over the debtor to give him or her an opportunity to engage in that bad conduct.  *See In re ABC Elec. Serv., Inc.*, 190 B.R. 672, 675 (Bankr. M.D. Fla. 1995) ("Control is to be determined by an examination of the facts and particularly whether or not the facts indicate an opportunity to self-deal or exert more control over the Debtor's affairs than is available to other creditors.")

Unlike the statutory insider, an employee's title alone will not dictate their status as an insider for *Wagoner* purposes. *See In re Global Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("The label an employer chooses to attach to a position is not dispositive for purposes of insider analysis because '[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive.'"); *In re Borders Grp., Inc.*, 453 B.R. 459, 468-69 (Bankr. S.D.N.Y. 2011) ("An individual's title, by itself, is insufficient to establish that an individual is a director or officer"); *In re 455 CPW Assoc.*, 2000 WL 1340569, at *5 (finding Vice-President of a limited partnership which served as a limited partner of the Debtor was not an insider); *In re Borders*, 453 B.R. at 469-70 ("director-level" employees were not insiders because they had no authority to implement company policies). *But see In re Madoff*, 458 B.R. at 124-25 (finding several senior level managers to be insiders for purposes of *Wagoner* and *in pari delicto* doctrines).

Just as an individual's formal title and position in a company should not determine their insider status, so too, a person's deliberate divesting of any formal title and position in a company should not, without closer inspection, dictate that he be deemed a third party, non-insider. Numerous courts and legal scholars have made the point that *Wagoner* severely limits the ability of a trustee to pursue valid claims against defendants that have acted against the interests of the debtor and its creditors. The question facing the Court today is whether a party, individual or corporate, can insulate itself from liability to the estate by simply avoiding having a title or formal designation, or whether the actual conduct of the party is determinative of its insider status? The Court sides with the latter view, and finds that in cases where a defendant may not fit the traditional role of an insider because they did not serve on the board of directors

or in management, the focus should turn on whether the defendant exercised control over the debtor.

An insider's status, i.e., control, should be determined "based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs." *In re Borders*, 453 B.R. at 469. An insider should either exercise sufficient authority over the debtor to "dictate corporate policy and the disposition of corporate assets" or have at least a "controlling interest in the debtor." *Id.* In establishing an insider's control and domination over a debtor, "the allegations must indicate something more than the monitoring of a debtor's operations and proffering advice to management." *In re KDI Holdings, Inc.*, 277 B.R. at 511. A third party may be deemed an insider when he executes "actual management of the Debtor's affairs" to afford him "an opportunity to self-deal." *In re 455 CPW Assoc.*, 2000 WL 1340569, at *5. The Court in *In re ABC Elec. Serv., Inc.*, defined "actual management" as control over "the Debtor's personnel or contract decisions, production schedules or accounts payable." 190 B.R. at 675 (citing *In re Chas P. Young Co.*, 145 B.R. 131 (Bankr. S.D.N.Y. 1992)). Often times, an insider's personal interests are "deliberately aligned with the corporation's interests," like with stock options or bonuses, "the value of which depends on the corporation's financial performance." *In re Lehr Constr. Corp.*, 551 B.R. at 744 (citing *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (2010)). Therefore, "general partners, sole shareholders, and sole decision makers," who typically share the same interest, will be considered insiders. *In re Madoff*, 458 B.R. at 124. "Even a third-party professional, typically the quintessential outsider, may surrender an *in pari delicto* defense where it exerts sufficient domination and control over the guilty corporation to render itself an insider." *Id.* The standard does not require total and singular domination over a corporation akin to an alter ego finding. *Cf. In re Madoff*, 458 B.R. at

27

124-25 (finding several senior level managers to be insiders for purposes of *Wagoner* and *in pari delicto* doctrines).

In conducting the "insider" analysis for purposes of the *Wagoner* doctrine, the Court will first consider whether the defendant served on the debtor's board or in management. If yes, the defendant is presumed to be an insider of the debtor. However, it is not a conclusive presumption. Instead, the burden shifts to the defendant to show that despite his formal title he did not exercise sufficient control over the debtor to be found an insider. If the defendant is not on the debtor's board or in management, then the defendant can rely on a presumption that it is not an insider. This presumption can be rebutted, however, if the Plaintiff can show "based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs" that the defendant exercised sufficient control over the debtor to be deemed an insider. *In re Borders*, 453 B.R. at 469.

To summarize, based on this Court's reading of the relevant caselaw, there are a number of factors that should be taken into consideration in this "totality of the circumstances" control analysis. Those factors are: (1) the close relationship between the debtor and the third party, *In re 455 CPW Assoc.*, 2000 WL 1230569, at *5 (finding an insider as one who has a sufficiently close relationship to the Debtor that his conduct is subject to closer scrutiny); (2) the degree of the individual's involvement in the debtor's affairs, *In re Borders Grp., Inc.*, 453 B.R. at 469; (3) whether the defendant had opportunities to self-deal, *In re ABC Elec. Serv., Inc.*, 190 B.R. 672; and (4) whether the defendant holds or held a controlling interest in the debtor corporation, *In re Borders*, 453 B.R. at 469.

**Application to Defendants**

The Court analyzes Ernest and Thomas' relationships to the Debtor separately.  As for the corporate defendants, because they are closely-held corporations owned and controlled solely by either Ernest or Thomas, and because it was partly through those corporate defendants that Ernest and Thomas exerted their control over the Debtor, Ernest and Thomas' insider status will also dictate the insider status of Amton, Bektrom, and TCB Consulting.  *See In re Refco*, 2010 WL 6549830, at *10 n.12, 30-31.

### A.  Ernest Barbella

The Plaintiff argues that Ernest controlled the Debtor because he ran the Debtor's business for years, did so for his own benefit, and deliberately obscured his role and relationship to the Debtor and its subsidiary QFB.  Ernest claims that he acted only as an outside consultant to the Debtor which was controlled exclusively by Faibish.  Despite Ernest's protestations to the contrary, the Court agrees with the Plaintiff and finds that Ernest exercised sufficient control over the Debtor to be considered an insider under the *Wagoner* doctrine.

First, Ernest had over a twenty-year working relationship with Faibish and maintained very close ties to the Debtor and Faibish, which put him in a position to participate in almost every aspect of the Debtor's business.  On paper, Ernest served as a "consultant" for the Debtor, but that was only after he divested himself of ownership and apparent authority over the Debtor's parent corporation which all appears to have been a calculated move intended to render himself judgment-proof.  *See discussion infra*.  Ernest also held himself out as a representative for the Debtor; he maintained his office space at the Debtor's offices and regularly interacted with the Debtor's employees, including his two sons, while there.  Ernest held himself out as a point of

contact for the Debtor with the Department of Homeland Security, represented himself as the "import director" for the Debtor, and from time to time held himself out as a person with a position of authority over the Debtor's affairs. Ernest's close family was firmly rooted in the Debtor's employ. The Debtor's grocery diverting business was managed by his son, Thomas, and his other son, Steven and wife, Marguerite, both held positions with the Debtor. *See In re KDI Holdings, Inc.*, 277 B.R. at 512 (stating that the defendant's insider status was bolstered by the fact that defendant's son was an officer and director of the Debtor). Therefore, the Plaintiff has established a sufficiently close relationship between Ernest and the Debtor.

The second factor focuses on the defendant's involvement in the debtor's affairs. The record here establishes that Ernest was intimately involved in the Debtor's affairs. He priced all QFB products, which he then authorized the Debtor to pay. Ernest sent expense reports to the Debtor's employees, and directed them to create invoices and make payments out of the Debtor's account for QFB. Darren Denson, in Debtor's accounts payable department, testified that he took direction from Ernest on whether an invoice was okay to pay. Trial Tr. 165:8-11 (Jan. 18, 2017). Ernest also controlled the Debtor's payments to Gourmet Select/Qingdao which appears to have been done with little or no involvement by Faibish. It also appears that Ernest instructed his son Stephen to transfer large amounts of money between the Debtor and QFB accounts; the Debtor's money was sometimes used to fund QFB's operations on a short-term basis. Trial Tr. 16:1-4; 17:1-5; 18:22-24 (Jan. 17, 2017). He also used the Debtor's employees to assist him in doing work for Gourmet Select.

The record also reflects that Ernest exerted significant influence over decisions affecting the Debtor's operations. First, he acquired MB Monroe and orchestrated the acquisition of Loretta Foods, ultimately to become QFB's baking mix business. He was the catalyst for the

Debtor's spice import business through his creation of Gourmet Select and Qingdao.  And his acquisition of Bektrom Foods (a company whose sole income was derived from the Debtor) created opportunities for the Debtor in the pasta and potato products market.

Ernest also handled various disputes for the Debtor which appear to be outside the stated scope of his "consulting" services.  He engaged in discussions with the Debtor's attorneys, disputed a legal issue pertaining to the Debtor's landlord, determined the settlement amount for that dispute, and handled a billing dispute for the Debtor.  Ernest also recommended that Faibish hire various employees for QFB and give bonuses to employees of Qingdao.

Finally, this Court will consider the last two factors, which look at whether the defendant had an opportunity to self-deal, and whether the defendant had a controlling interest in the debtor company.  While at one time, Ernest may have held a controlling interest in Synergy, it appears that during the time period in question, he held shares of less than five percent and therefore he did not have a controlling ownership interest in the Debtor's parent company during the time period in question.  Trial Tr. 40:7-8, 23-25; 51:2-21 (Oct. 05, 2016).  However, Ernest's interactions with the Debtor and its employees did give him the opportunity to self-deal.  Ernest testified that he loaned money to the Debtor on an in and out basis, especially at times when Faibish requested financial support.  Trial Tr. 121:19-122:9 (Aug. 02, 2016); *see In re KDI Holding*, 277 B.R. at 513 (finding that the insider defendant exercised control because it financed the Debtor during a period of financial difficulty and used that situation for its own benefit).  The record also reflects that Ernest also used the Debtor's assets and employees to support his own company, Gourmet Select.  This shows he not only had the opportunity to use the Debtor's assets to his own benefit, but he did so.  In addition, Ernest made strategic decisions that impacted the Debtor to his own benefit.  For example, he testified that he purposely priced products for QFB

31

at a small profit so that it would increase the value of his shares in Synergy. And Richard Cohen, QFB's CEO, testified that Ernest was on both sides of the negotiations between the Debtor and Ernest's company, Bektrom. Finally, the fact that Ernest worked in the Debtor's offices gave him access to information about the Debtor that Ernest could have used to his advantage. Ernest testified that he shared his office with his son, Stephen, and that Stephen shared information with him regarding the Debtor's finances.

Ernest argues that he was not an insider because he was not on the board of directors, was not an officer, and did not exercise control over the Debtor. He relies heavily on Faibish's role in the company to prove his own lack of control, specifically arguing that Faibish was the only individual who actually made decisions for the Debtor and that he reported to Faibish. Trial Tr. 149:19-22 (Aug. 02, 2016). Though not determinative of the Court's conclusion, it should be noted that the Barbella Defendants, at no time solicited testimony or an affidavit from Faibish to support these claims. The testimony in support of Faibish's control over the Debtor to the exclusion of Ernest, is either subject to conflicting evidence, or was provided by witnesses who are currently in Ernest's employ or witnesses who had no first hand knowledge of the day to day operations of the Debtor, and thus must be discounted. In sum, Ernest's claims that he was an innocent third party are belied by the totality of the evidence presented to the Court, and they stand unsupported by credible testimony.

In addition, Ernest's testimony at trial was inconsistent and this Court finds his credibility to be lacking. For example, Ernest signed a document identifying himself as the director of operations for Synergy, but later testified that he had nothing to do with Synergy operations. Trial Tr. 183:22-184:4 (Oct. 06, 2016). He testified that the Debtor was issuing orders to Qingdao, but then later stated QFB was the one issuing orders, not the Debtor. Trial Tr. 69:2-22

32

(Aug. 02, 2016). Ernest was also inconsistent in representing his relationship to the various companies engaged in business with the Debtor. He initially stated that he built the Debtor's subsidiary business, QFB, but later claimed he was not involved in the formation of QFB. Trial Tr. 39:9-13 (July 07, 2016); Trial Tr. 99:15-19 (Oct. 06, 2016). He testified that he did not control or form Gourmet Select and Qingdao, yet in a prior deposition he stated that he formed Qingdao. Trial Tr. 53:1-19 (July 07, 2016). This was corroborated by Joel Sebastian (Synergy director), who testified that Ernest owned Qingdao. Trial Tr. 100:15-17 (Jan. 12, 2017). Similarly, Ernest stated in his deposition that Faibish was a 50% owner of Bektrom, but at trial he stated that that was not true. *Id.* at 26:24-27:6. There was, as they say, an "alternate" set of facts when it came to Ernest's testimony. Therefore, the Court finds his testimony to be unreliable and the Court will not credit his self-serving testimony that Faibish exercised sole and exclusive control over the Debtor.

In addition, Ernest acknowledged that he purposely put every company he owned in his wife's name despite the fact that he was the true person in control. Trial Tr. 148:8-18 (Oct. 05, 2016). More specifically, Ernest testified that he had a judgment against him and "that's the reason why [he] couldn't put [his] name on any activity." Trial Tr. 122:12-13 (Aug. 02, 2016). This further undermines his credibility and bolsters the Court's belief that Ernest served as a puppeteer, overseeing and managing every aspect of the Debtor's business without showing any formal title or role with the company. It is clear to the Court that Ernest purposefully avoided any signs of formal control by placing his companies in his wife's name and by manipulating roles at the Debtor for his wife and sons.

The evidence presented establishes that Ernest exercised "something more than the monitoring of a debtor's operations and proffering advice to management." *In re KDI Holdings*,

277 BR at 511.  Ernest not only maintained a close relationship to the Debtor through his control over every aspect of the business, but he also directed the Debtor's employees, authorized payments for the Debtor, and influenced various decisions regarding the Debtor's business.  In addition, any decision made by Ernest with respect to his companies directly impacted the Debtor because of the interdependence of each and every company.  Therefore, the Plaintiff has shown by a preponderance of the evidence that Ernest exercised sufficient control over the Debtor to be deemed an insider, thus precluding application of the *Wagoner* doctrine.

Insider status will also be given to Amton and Bektrom because those companies were closely-held by Ernest, and they were vehicles through which Ernest exercised his control over the Debtor.  Both Amton and Bektrom existed solely to assist Ernest's efforts to control the Debtor's operations without actually appearing to control them, and Ernest's actions detailed herein, can all be imputed to those companies.  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000) ("It is a 'fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation.'").

**B.  Thomas Barbella**

The Plaintiff asserts that Thomas Barbella was an insider of the Debtor for two reasons: (1) he served as a senior officer to the Debtor, and (2) he ran the Debtor's $30 million grocery diverting business.  As the Court has framed the analysis, the presumption is that Thomas is an insider because he served in Debtor's management.  Thomas, however, attempts to rebut the presumption by arguing that despite his title he did not exercise sufficient control over the Debtor to be deemed an insider. *See In re Global Aviation*, 478 B.R. at 148 (finding that employees title of a "director" was insufficient for an insider status because they did not have

responsibilities of a corporate director and did not report or attend board meetings).  Unlike the employees in *In re Global Aviation*, however, Thomas not only held a management title, but also took on the responsibilities attendant to this title.  The record reflects that Thomas did in fact manage the Debtor's grocery business.  In this managerial role, Thomas had check writing authority, managed the Debtor's accounts payable, and signed off on invoices and approved sales.  Trial Tr. 69:24-25; 156:16-20; 164:4-9 (Jan. 18, 2017).  He also actively managed and supervised the sales team members.  *Id.* at 136:6-15.

Thomas contends that he did not exercise control over the Debtor because his authority over the sales team members and the grocery business was not discretionary but was done at the direction of Faibish.  *See In re 455 CPW Assoc.*, 2000 WL 1340569, at *5 (finding that the defendant did not actually manage the debtor's affairs because he "exercised and functioned pursuant to someone else who [was] in control").  Thomas testified that if a product was less than the net profit, he was required to seek approval from Faibish before proceeding with the product.  Thomas also claims he was only ensuring that the sales team members priced products within the guidelines that Faibish provided to him.  However, as with Ernest, this self-serving testimony is insufficient to rebut the presumption of his insider status.  As with Ernest, at no time did Thomas solicit unbiased testimony or an affidavit from Faibish to corroborate his claim that he was merely an employee following direction.

Furthermore, Thomas had a close relationship to the Debtor through his familial relationship to Ernest, whom the Court has already established as an insider of the Debtor, and he had a long employment history with Synergy and before that, Krantor.  His current ownership of Bektrom, a company closely tied to the Debtor's business which employs several of the Debtor's former employees, is another tie binding him closer to the Debtor.  Finally, Thomas' company,

TCB Consulting, which was supposedly formed only as a vehicle through which Thomas would act as a consultant to QFB, was used in connection with Faibish's check-kiting scheme.   All of this, taken together, solidifies Thomas' entrenchment as an insider of the Debtor.   Therefore, the Plaintiff has established by a preponderance of the evidence that Thomas maintained sufficient control over the Debtor to be deemed an insider for purposes of the *Wagoner* doctrine.

Insider status will also be given to TCB Consulting, Inc. because it was closely-held and and controlled by Thomas and was used by Thomas to further his involvement with the Debtor and its affiliates.   As a closely-held corporation, Thomas' role as an insider can be imputed to TCB Consulting, and the *Wagoner* doctrine does not bar the Plaintiff from asserting its claims against this Defendant.   *Wight*, 219 F.3d at 86 ("It is a 'fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation.'").

## CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiff has shown by a preponderance of the evidence that each of the Barbella Defendants are insiders of the Debtor and thus the *Wagoner* doctrine does not defeat Plaintiff's standing.[15]   The remainder of the Barbella Defendants' arguments in favor of dismissal are preserved.   A further hearing will be

---

[15]        The Court notes, as it did earlier in this Decision that certain aspects of the claims asserted in the Amended Complaint are not even subject to the *Wagoner* analysis.  Those claims which allege wrongdoing by the Barbella Defendants, independent of any involvement with Faibish, are not affected by *Wagoner* because they do not allege wrongdoing with the cooperation of management.  *See supra* note 3. Even if the Barbella Defendants were found to be third parties, not insiders, those claims would survive a *Wagoner* challenge.

held on March 26, 2018 at 9:30 a.m. in Courtroom 860 to address the resolution of the remainder

of the motion.



**Dated: Central Islip, New York**
**February 8, 2018**

**Robert E. Grossman**
**United States Bankruptcy Judge**